### IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### PINE BLUFF DIVISION

**DAVID YOCUM, IV,** *et al.*                                                    **PLAINTIFFS**

**v.**                                    **5:09-CV-00123-WRW**

**ST. PAUL MERCURY INSURANCE COMPANY**                         **DEFENDANT**

#### ORDER

Pending are a Motion for Partial Summary Judgment (Doc. No. 27) by Separate Plaintiffs

David Yocum, IV and Jeff Baxter; a Motion for Partial Summary Judgment (Doc. No. 29) by

Separate Plaintiffs Tom Pugh, Frank Pugh, and Farm Bureau Mutual Insurance Company of

Arkansas, Inc.; and Defendant's Motion for Summary Judgment (Doc. No. 51). The parties have

responded and replied.[1] For the reasons set out below, David Yocum, IV and Jeff Baxter's

Motion for Partial Summary Judgment is DENIED; the Pugh / Farm Bureau Motion for Partial

Summary Judgment is DENIED; and Defendant's Motion for Summary Judgment is

GRANTED.

Also pending is Defendant's Motion to Strike Plaintiffs' Summary Judgment Evidence

(Doc. No. 33). Plaintiffs have responded, and Defendant has replied.[2] Defendant's Motion is

DENIED.

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact, so

that the dispute may be decided on purely legal grounds.[3]  The Supreme Court has established

guidelines to assist trial courts in determining whether this standard has been met:

---

[1]Doc. Nos. 35, 44, 47, 55, 57.

[2]Doc. No. 40, 41.

[3]*Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56.

The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[4]

The Court of Appeals for the Eighth Circuit has cautioned that summary judgment is an

extreme remedy that should be granted only when the movant has established a right to the

judgment beyond controversy.[5]  Nevertheless, summary judgment promotes judicial economy by

preventing trial when no genuine issue of fact remains.[6]  I must view the facts in the light most

favorable to the party opposing the motion.[7]  The Eighth Circuit has also set out the burden of

the parties in connection with a summary judgment motion:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*,"[to point] out to the District Court," that the record does not disclose a genuine dispute on a material fact.  It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.  Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue.  If the respondent fails to carry that burden, summary judgment should be granted.[8]

Only disputes over facts that may affect the outcome of the suit under governing law will

properly preclude the entry of summary judgment.[9]

---

[4]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[5]*Inland Oil & Transport Co. v. United States*, 600 F.2d 725, 727 (8th Cir. 1979).

[6]*Id.* at 728.

[7]*Id.* at 727-28.

[8]*Counts v. MK-Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988) (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)).

[9]*Anderson*, 477 U.S. at 248.

## II.    BACKGROUND[10]

Plaintiffs David Yocum, IV, Jeff Baxter, Tom Pugh, and Frank Pugh[11] ("Yocum, Baxter,

and the Pughs" or "Plaintiffs") were sued in an earlier lawsuit (the "Underlying Lawsuit") --

Plaintiffs were defendants in the Underlying Lawsuit. Plaintiffs maintain that Defendant St. Paul

Mercury Insurance Company had a duty to defend them in the Underlying Lawsuit, even though

they were not sued in their insured capacities. Defendant disagrees, so we have this action.

### A.    Plaintiffs' Involvement in Various Companies

Plaintiffs participated in numerous companies involved in catfish farming. All four men

were officers and directors of Catfish Producers, LLC ("Catfish Producers"),[12] and each held an

ownership interest in that company.[13]

At the same time, Plaintiffs were also officers and directors of Farm Fresh Catfish

Company, Inc. ("Farm Fresh Catfish"), which was owned by Catfish Producers.

Plaintiffs formed another company, Farm Fresh Producers, LLC ("FFP").

In August, 2001, Farm Fresh Catfish made a private offering for the sale of stock and

delivery rights to FFP, which then offered the sale of stock and delivery rights[14] to various

---

[10]Unless otherwise noted, the facts in the Background section were taken from the parties' statements of material fact. Doc. Nos. 28, Exhibit 2; 29, Exhibit B; 35, Exhibit L; 51, Exhibit L; and 55, Exhibit B.

[11]Plaintiff Farm Bureau Mutual Insurance Company of Arkansas, Inc. provided Tom Pugh and Frank Pugh a defense in the Underlying Lawsuit, and seeks equitable subrogation here.

[12]Jeff Baxter was also an officer of Baxter Land Company.

[13]David Yocum, IV held an ownership interest in Catfish Producers through Alice Sidney Farms. Jeff Baxter held an ownership interest in Catfish Producers through Baxter Land Company. Tom Pugh and Frank Pugh held an ownership interest in Catfish Producers through Top Cat Fisheries.

[14]The delivery rights gave the holder the opportunity to sell specified quantities of fish to a processor.

Arkansas catfish farmers. The plaintiffs in the Underlying Lawsuit, and others, bought the

securities and delivery rights offered in the August, 2001, private offering.

On August 7, 2002, Catfish Producers, FFP, and Southeast Arkansas Catfish Producers,

LLC, formed Arkansas Catfish Growers, LLC d/b/a Seacat ("Seacat").[15] Seacat's managing

board was made up of three people plus an alternate from each of its three members. Plaintiffs

were Catfish Producers's representatives on Seacat's Managing Board.

Around September 1, 2002, Farm Fresh Catfish sold its assets to Seacat and ceased

operations.[16] In connection with the sale, Seacat assumed a $3,000,000 ADFA note executed by

Farm Fresh Catfish.[17] Additionally, each Seacat member holding Farm Fresh Catfish delivery

rights executed an Acceptance of Delivery Rights in Seacat.[18]

B.    The Underlying Lawsuit

On August 13, 2004, the complaint in the Underlying Lawsuit (the "Underlying

Complaint") was filed,[19] naming Yocum, Baxter, the Pughs, Catfish Producers, LLC, and Baxter

Land Company (among others) as defendants. The Underlying Complaint alleges that Yocum,

Baxter, and the Pughs were acting at all times in their own personal interest or in the interest of

Catfish Producers or Baxter Land Company. The Underlying Complaint does not make

allegations against Yocum, Baxter, or the Pughs as directors of Seacat, nor does it name Seacat

---

[15]Doc. No. 27, Exhibits A, A-1, A-2. On September 18, 2002, Arkansas Catfish Growers registered the fictitious name "Seacat." Doc. No. 27, Exhibit A -1.

[16]Doc. Nos. 27, Exhibit A; 42, Exhibit A.

[17]On February 28, 2002, the Arkansas Development Finance Authority ("ADFA") loaned Farm Fresh Catfish Company $3,000,000. Plaintiffs personally guaranteed the loan.

[18]*Id.*

[19]The Underlying Complaint was filed in the Pulaski County, Arkansas, Circuit Court.

as a defendant. It is undisputed that the Underlying Complaint intentionally omitted references to Seacat, thereby avoiding the jurisdiction of the bankruptcy court.

The Underlying Complaint focuses on the period around 2001 and alleged misrepresentations in connection with the private offering of stocks and delivery rights. The causes of action alleged in the Underlying Complaint are intentional misrepresentation; violation of the Arkansas Securities Act; intentional interference with contract and economic expectations; promissory estoppel; breach of contract and third party beneficiary; negligence; and breach of duty of good faith and fair dealing.[20] There was a defendants' verdict in the Underlying Lawsuit.

C.      Relevant Policy Terms and Provisions

In December, 2003, Defendant in this action, St. Paul, issued a management liability insurance policy (the "Policy") to Seacat. The Policy included Directors and Officers ("D&O") Individual Coverage, Company Indemnification Coverage, and Company Liability Coverage. The Policy was a claims made policy, and covered claims made against an insured during the policy period -- from November 3, 2003, to November 4, 2004.  Around September 13, 2004, Seacat bought an extended discovery period tail policy that covered claims made during the policy period of November 3, 2004, to November 3, 2005. Defendant had the duty to defend all covered claims.

The Management Liability Insuring Agreement ("Insuring Agreement") provides that the "Insurer will pay on behalf of the Insured Persons Loss . . . which the Insured Persons become legally obligated to pay on account of any Claim first made against them . . . for a Management Practices Act."[21] The Insuring Agreement also provides that when it is the duty of the Insurer to

---

[20]Doc. No. 51, Exhibit A-40. Not all claims were submitted to the jury.

[21]Doc. No. 16, Exhibit 2. Insuring Agreement, page 1.

defend, the Insurer has the right and duty to defend any claim covered by the Insuring

Agreement.[22]

The definition of Claim under the Policy includes "a civil proceeding against any Insured

commenced by the service of a complaint or similar pleading" on account of a Wrongful Act.[23]

Wrongful Act is defined as "Management Practices Act, Employment Practices Act, Fiduciary

Act and Third-Party Discrimination Act, but only to the extent that coverage is granted for such

acts pursuant to an Insuring Agreement made part of this Policy."[24]

Management Practices Act means:

> (a) any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any Insured Person in their capacity as such, or in an Outside Position or, with respect to the Company Liability Coverage, by the Company; or

> (b) any matter claimed against the Insured Persons solely by reason of their serving in such capacity or in an Outside Position.

Management Practices Act does not include any conduct actually or allegedly committed or attempted by any Insured Person in their capacity as a director, officer, trustee, governor, member of the board of managers, or any equivalent position, or employee of any entity other than the Company, even if service in such capacity is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the Insured Person by the Company, except in their capacity in an Outside Position.[25]

Outside Position means:

the position of director, officer, manager, trustee or other equivalent executive position held by any Director or Officer of the Company in:

> (a) any Non-Profit Entity not included in the definition of Company; or

---

[22]*Id*. Insuring Agreement, page 1.

[23]*Id*. General Terms, Conditions and Limitations, page 2.

[24]*Id*. General Terms, Conditions and Limitations, page 7.

[25]*Id*. General Terms, Conditions and Limitations, page 5.

(b) any other entity, if such coverage is specifically granted by endorsement to the Policy,

if service in such position is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the Director or Officer by, the Company.[26]

Insured Persons means "Directors or Officers, and only to the extent that coverage is granted as set forth in the Declarations, Employees, Leased Employees, and Independent Contractors."[27] Insured Persons here are Yocum, Baxter, and the Pughs.

Director or Officer means: "any natural person who was, now is or shall be a duly elected or appointed director, officer, member of the board of managers, or management committee member of any Company incorporated or chartered in the United States of America."[28] Company means "any entity named in the Declarations and its Subsidiaries . . . ."[29] The Company here is Seacat.

The Policy includes an Allocation Clause, which reads in part:

If on account of any Claim the Insureds who are covered for such Claim under this Policy incur Loss jointly with others, including any Insureds who are not covered for such Claim under this Policy, or the Insureds incur an amount consisting of both Loss covered by this Policy and loss not covered by this Policy because the Claim includes both covered and uncovered matters, the Insureds and the Insurer shall allocate such amount between covered Loss and uncovered loss as follows:

(a) all Defense Costs incurred by covered Insureds for such claims shall be paid as Loss; and

---

[26]*Id*. General Terms, Conditions and Limitations, page 6.

[27]Doc. No. 16, Exhibit 2. General Terms, Conditions and Limitations, page 6.

[28]*Id*. General Terms, Conditions and Limitations, page 3.

[29]*Id*. General Terms, Conditions and Limitations, page 3.

(b) all loss, other than Defense costs, arising from such Claims shall be allocated between covered Loss and uncovered loss based upon the relative legal exposures of the parties to covered and uncovered matters.[30]

Loss means: "the amount which the Insureds become legally obligated to pay on account of each Claim and for all Claims made against them during the Policy Period . . . for Wrongful Acts for which coverage applies, including . . . Defense Costs."[31]

Defense Costs means: "that part of Loss consisting of reasonable costs, charges, fees (including attorneys' fees, experts' fees, and mediators' or arbitrators' fees) . . . incurred in defending or investigating a Claim . . . ."[32]

## III.   DISCUSSION

Plaintiffs are not identified in the Underlying Complaint in their insured capacity. Plaintiffs ask the Court to infer from extrinsic evidence that the Underlying Complaint contains allegations against Yocum, Baxter, and the Pughs in their capacity as Seacat directors. Plaintiffs assert that Defendant had a duty to defend, based on what Defendant knew in addition to the allegations in the Underlying Complaint. Defendant, of course, disagrees.

Under Arkansas law, the allegations in the pleadings against the insured determine the insurer's duty to defend.[33] Although there may be situations in which the insurer's duty to defend cannot be determined from the pleadings alone,[34] generally "it is the allegations made against the insured -- however groundless, false, or fraudulent such allegations may be -- that

---

[30]*Id*. General Terms, Conditions and Limitations, page 13.

[31]*Id*. General Terms, Conditions and Limitations, page 5.

[32]*Id*. General Terms, Conditions and Limitations, page 3.

[33]*Murphy Oil United States v. Unigard Sec. Ins. Co*., 347 Ark. 167, 175-76 (2001).

[34]*Mattson v. St. Paul Title Co. of the South*, 277 Ark. 290, 292 (1982).

determine the duty of the insurer to defend the litigation against its insured."[35] The insurer's

duty to defend may be broader than its duty to indemnify, and the duty to defend "arises when

there is a possibility that the injury or damage may fall within the policy coverage."[36] Any doubt

as to whether the pleadings state a claim that falls within the policy coverage must be resolved

in favor or the insured.[37]

The language in an insurance policy must be construed in its "plain, ordinary, and

popular sense."[38] Where the policy language is unambiguous, and there is only one reasonable

interpretation of the language, the courts "give effect to the plain language of the policy without

resorting to the rules of construction."[39] If policy language is ambiguous, the language of the

policy is construed strictly against the insurer.[40] Once it is determined that there is coverage

under a policy, then the court analyzes whether any exclusion precludes coverage.[41]

### A.      Management Practices Act

Defendant had no duty to defend in the Underlying Lawsuit because, based on the

definition of a Management Practices Act, the Policy does not cover dual capacity claims.

The definition of a Management Practices Act is unambiguous. First, the definition sets

out what a Management Practices Act is. Then the definition describes what a Management

Practices Act is not. As set out above, a Management Practices Act does not include conduct

---

[35]*Proctor Seed & Feed Co. v. Hartford Acci. & Indem. Co.*, 253 Ark. 1105, 1108 (1973).

[36]*Murphy Oil*, 167 Ark. at 176.

[37]*Id*. at 178.

[38]*Deschner v. State Farm Mut. Auto. Ins. Co.*, 375 Ark. 281, 284 (2008).

[39]*Id*.

[40]*Id*.

[41]*Id*.

allegedly committed by an Insured Person in his capacity as a director "of any entity other than the Company" -- even when the conduct as a director of the other entity is "part of the duties regularly assigned to the Insured Person by the Company. . . ."[42]

The following example illustrates why a dual capacity claim does not fall under the definition of a Management Practices Act.

An insurance company issues a policy identical to the one in this case to Company A. John Doe is a director in Company A. As part of his duties as director in Company A, John Doe is also a director in Company B. John Doe is sued in his capacity as a director in Company B. Because John Doe is a director in Company B as required by his duties as director in Company A, John Doe is necessarily acting in his capacity as a director in Company A -- and thus, he is acting as an Insured Person, but the Policy precludes coverage in this dual capacity scenario. Under the definition of a Management Practices Act, a Claim against John Doe as director of Company B would not be a covered Claim, and the Insurance Company would have no duty to defend. The Allocation Clause, which addresses Loss with respect to covered and uncovered matters within a covered Claim, would not come into play because the Claim against John Doe as director of Company B does not trigger coverage. The definition of a Management Practices Act, Claim, and the Allocation Clause, are consistent.

If actions taken in a dual capacity mandated by an insured company are not a Management Practices Act, it would be inconsistent with the terms of the Policy to find that actions taken in a voluntary dual capacity are a Management Practices Act. Because Yocum,

_____

[42]Policy at page 5 of 17.

Baxter, and the Pughs were acting in a dual capacity, their actions did not qualify as a

Management Practices Act and Defendant had no duty to defend.

### B.       Capacity in Which the Directors Were Sued

Defendant had no duty to defend because there was no possibility of liability under the

Policy. In *Allstate Insurance Company v. Continental Casualty Company*,[43] an unpublished

case, no allegation identified any party in his insured capacity.[44]  The Arkansas Court of

Appeals noted that "from the allegations in the complaints it is difficult to ascertain with any

certainty whether they give rise to a possibility of coverage, due in part to the conspicuous

absence in the complaints of any facts concerning the employment relationships of the

parties."[45] The court found that even considering what the insurance companies knew about the

employment relationships, exclusions applied that negated the possibility of coverage.[46]

In *Bowie v. Home Ins. Co.*,[47] the Ninth Circuit Court of Appeals found an insurance

company had no duty to defend where the defendant was not sued in his insured capacity. The

Ninth Circuit pointed out that "no court has said that an insurer must defend an insured *not yet*

*named* in an insured capacity as a defendant in a suit, even though a complaint could be so

---

[43]No 92-652, 1993 Ark. App. Lexis 276 (Ark. App. May 5, 1993).

[44]*Id.* at *6.

[45]*Id*. at *9.

[46]*Id*. But see *Homebank of Arkansas v. Kansas Bankers Surety Company*, No. 4:06-CV-01670-SWW, 2008 U.S. Dist. Lexis 51767 (E.D. Ark. July 7, 2008). In *Homebank*, a defendant in an underlying lawsuit was not sued in his insured capacity. But ,the court found that the underlying counterclaim made allegations against the defendant as an insured because, among other reasons, the underlying counterclaim contained references to the defendant in his insured capacity and the insured company was named as a defendant in the underlying action. The *Homebank* court found that the insurance company had a duty to defend.

[47]923 F.2d 705 (9th Cir. 1991).

amended,"[48] while noting that "if the facts discovered indicate that the complaint was really

intended to sue the defendants in their insured capacities, but by inadvertence referred to them

in uninsured capacities, a different result might ensue."[49] Other courts that have reached the

same result.[50]

In the Underlying Complaint, Seacat is not named as a defendant, and neither Yocum,

Baxter, nor the Pughs are identified as directors of Seacat. Because the Underlying Complaint

was drafted to omit reference to Seacat, there is no chance that the omission was inadvertent.

Coverage was not triggered under the Policy because there was no possibility for coverage

under the Policy.

Because there was no duty to defend, Defendant has no duty to reimburse Plaintiff Farm

Bureau Mutual Insurance Company of Arkansas, Inc. for any defense costs.

**C.      Dual Capacity and the Alleged Wrongful Conduct**

Defendant's duty to defend was not triggered in the Underlying Lawsuit because

Plaintiffs' actions as directors of Catfish Producers and Seacat were inextricably intertwined. In

*Continental Casualty Company v Adams*,[51] a dual capacity case in which the court found no

duty to defend, the court analyzed the nature of the allegations in the complaint, and found that

"[t]he claim against [the defendants] in their capacities as officers and directors of [two

_____

[48]*Id*. at 709 (emphasis in original).

[49]*Id*. at n.3.

[50]See *United States Fidelity and Guaranty Company v. Frosty Bites, Inc*. 350 F. Supp. 2d
508 (S.D.N.Y. 2004) (Because there were no allegations that suggested potential liability on the
part of the defendant arising out of his duties as an insured director, the insurance company had
no duty to defend.); *Goerner v. Axis Reinsurance Company*, No. CV 07-0166-GHW(MLGx),
2009 U.S. Dist. Lexis 14067 (C.D. Cal. Feb. 23, 2009) (no duty to defend because the underlying
plaintiff did not seek to impose liability on the defendant in his capacity as an officer or director
of the insured company).

[51]No. 3: CV-02-1122, 2003 U.S. Dist. Lexis 16434 (M.D. Pa. Sept. 12, 2003).

companies] are inextricably intertwined . . . ."[52]  Because the actions of the defendants as directors or officers in two companies were inextricably intertwined, the court found there was no duty to defend.

In *FSLIC v. Mmahat*,[53] a dual capacity case, the district court found that "Mmahat's dishonesty as director was an integral part of his dishonesty as a lawyer."[54]  The court found that Mmahat would not have been able to accomplish his wrongful conduct but for his capacity as both a corporate director and a corporate lawyer, and found that the insurance company had no duty to defend.

In *McAninch v. Wintermute*,[55] the Eighth Circuit Court of Appeals discussed *Mmahat*. Wintermute was indicted for actions allegedly taken as a "director, owner, and otherwise in any capacity" in an insured company. The insurer argued it had no duty to defend Wintermute because she was acting in multiple capacities, but offered no explanation as to how Wintermute's dual status facilitated any wrongdoing. The Eighth Circuit concluded that "an insurer may not avoid its duty to indemnify for alleged wrongful conduct merely by arguing the director was also an owner, shareholder, etc., without some explanation as to how this dual capacity related to or facilitated the wrongful conduct alleged."[56] The Eighth Circuit distinguished *McAninch* from *Mmahat* based on the "but for the dual role" aspect, because there was no explanation in *McAninch* as to how Wintermute's dual capacity facilitated wrongdoing.

---

[52]*Id*. at *32.

[53]No. 86-5160, 1988 U.S. Dist. Lexis 15740 (E.D. La. Dec. 1988).

[54]*Id*. at *9.

[55]491 F.3d 759 (8th Cir. 2007).

[56]*Id*. at 772.

If the Underlying Complaint alleges fraudulent actions by Plaintiffs as directors of Seacat, Plaintiffs could not have taken the alleged fraudulent actions but for their positions as directors of Catfish Producers. Even if the Policy does allow for dual capacity claims, Defendant had no duty to defend because Plaintiffs' actions as directors of Catfish Producers and as directors of Seacat were inextricably intertwined.

In 2001, Plaintiffs were directors of both Catfish Producers and Farm Fresh Catfish, and they owned membership interests in both companies. Farm Fresh Catfish was allegedly in financial dire straights when Plaintiffs caused  FFP to be formed. Yocum, Baxter, and the Pughs allegedly made misrepresentations to entice investment through FFP. The Underlying Complaint cited the combined minutes of the boards of directors of Catfish Producers and Farm Fresh Catfish extensively to show that Yocum, Baxter, and the Pughs knew Farm Fresh Catfish's financial status was grim.

In 2002, Farm Fresh Catfish sold its assets to Seacat, and Seacat assumed Farm Fresh Catfish's debt (which had been personally guaranteed by Plaintiffs.) Allegedly, Yocum, Baxter, and the Pughs continued to prevent the plaintiffs in the Underlying Lawsuit from learning of Farm Fresh Catfish's actual financial situation. Under these specific circumstances, Plaintiffs could not have engaged in misconduct as Seacat directors without acting as directors for and in the interest of Catfish Producers.

## CONCLUSION

Based on the findings of fact and conclusions of law above, Defendant's Motion for Summary Judgment (Doc. No. 51) is GRANTED. Plaintiffs' Motions for Partial Summary Judgment (Doc. Nos. 27, 29) are DENIED, and Defendant's Motion to Strike (Doc. No. 33) is DENIED.

IT IS SO ORDERED this 27th day of May, 2010.

/s/ Wm. R. Wilson, Jr._____
UNITED STATES DISTRICT JUDGE